IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:13-CR-186-6 |
| | ) | |
| ANGELA MICHELLE BECK, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

Angela M. Beck is a federal prisoner serving a sentence for drug and firearms offenses. She has cancer in her left breast and the Bureau of Prisons has not provided appropriate medical care for her disease, with repeated delays that have prevented her from timely obtaining urgent tests and treatment. In the meantime, her cancer spread to her lymph nodes and possibly to her right breast. Ms. Beck has filed a motion under the First Step Act of 2018 seeking immediate compassionate release. Because Ms. Beck's invasive cancer and BoP's history of indifference to her treatment constitute extraordinary and compelling reasons, and because the § 3553(a) factors support a sentence reduction to time served, the motion for compassionate release will be granted.

## I.     Facts and Procedural History

The Court has considered the record evidence in this criminal case, where Ms. Beck submitted her motion for compassionate release. The Court has also considered the documentary evidence submitted in Ms. Beck's civil case against BoP officials for

inadequate medical care in violation of her constitutional rights.  *See Beck v. Hurwitz*, No. 1:19–cv–00488 (M.D.N.C. May 10, 2019).  Unless otherwise specified, docket citations are to the criminal case.[1]

Beginning sometime in 2012, Angela Beck and her husband began operating a methamphetamine lab in their home in Surry County, North Carolina.  *See* Doc. 192 at 12–13.  They participated in a conspiracy to distribute methamphetamine that included many other participants, *see* Doc. 73 (identifying 20 defendants), and other labs.  *See* Doc. 192 at 1–20.  During a search of the Beck home on January 4, 2013, law enforcement located items consistent with the manufacture of methamphetamine, 12 firearms, and drug paraphernalia.  *Id.* at 12–13.  Several persons on the premises possessed methamphetamine, including Ms. Beck.  *Id.* at 13.  In the preceding months, Ms. Beck had purchased over 42 grams of pseudoephedrine, one of the precursor chemicals that can be used to manufacture methamphetamine.  *Id.* at 14.

After Ms. Beck was arrested on state charges and released on bond, *see* Doc. 429-1 at 1, she and her husband continued to manufacture and sell meth out of their home.  Doc. 192 at 16.  During a search on February 18, 2013, law enforcement located items consistent with the manufacture of methamphetamine, a revolver and ammunition, drug paraphernalia, and numerous cell phones.  *Id.*

---

[1] Citations to documents filed on the docket of Ms. Beck's civil case will be cited as "Civil Doc. #," and citations to medical records contained in exhibits filed in her civil case and incorporated in filings in this criminal case will be to the date of the appointment and provider name, with the bates pagination in brackets.

Several months after her second arrest, Ms. Beck pleaded guilty in this Court to conspiracy to distribute 500 grams or more of methamphetamine (Count 1, object 1) and possession of a firearm in furtherance of a drug trafficking crime (Count 12). Doc. 201 at ¶¶ 1–2; Minute Entry 09/06/2013. The Court granted the Government's motion under U.S.S.G. § 5K1.1 to depart from the guidelines, Doc. 249; Minute Entry 12/12/2013, and sentenced her to 129 months of imprisonment as to Count 1 and, as required by law, to a consecutive term of 60 months as to Count 12, for a total sentence of 189 months. Doc. 277 at 2. The Fourth Circuit dismissed her appeal. Doc. 363. The Court later reduced her sentence on Count 1 to 105 months based on a retroactive sentencing guideline amendment, making her total sentence 165 months. Doc. 442.

Ms. Beck is in the custody of the United States Bureau of Prisons and is assigned to the Federal Correctional Institution in Aliceville, Alabama. Civil Doc. 3-3 at ¶ 1; Civil Doc. 12 at ¶ 3. She has served approximately 76 months of her 165-month sentence. *See* Doc. 429-1 at 1. There is nothing in the record to indicate that she has incurred any disciplinary violations or infractions while in BoP's custody.

Ms. Beck is 47-years old, Doc. 429-1 at 3, and has a family history of breast cancer. Civil Doc. 3-3 at ¶ 3. In the fall of 2017, she discovered lumps in her left breast and promptly sought medical attention. *Id.* at ¶¶ 2, 4–5. When she first saw the prison doctor to report the masses, *see id.* at ¶ 6, he recommended imaging and consultation with a surgeon, 10/16/2017—Griffin [BoP 22], but almost two months passed before BoP took

Ms. Beck to see a surgeon. Civil Doc. 3-1 at ¶ 19.[2] Imaging results obtained two weeks later were "highly suggestive" of cancer, *id.* at ¶ 19; 12/22/2017—DeVenny [BoP 36], and in the ensuing days, weeks, and months, Ms. Beck's doctors repeatedly said she needed a biopsy to test for cancer. *See, e.g.*, 12/22/2017—DeVenny [BoP 36]; 12/29/2017—Griffin [BoP 39]; 01/08/2018—Griffin [BoP 65]; 05/11/2018—Griffin [BoP 96]; 08/07/2018—Bilton [BoP 110]. A biopsy should be performed no more than two months after the detection of an abnormality, Civil Doc. 3-1 at ¶ 11, but BoP waited eight months after imaging before taking her for a biopsy. *Id.* at ¶ 20.

When the biopsy was finally performed, the surgeon observed "extensive breast disease that extended laterally." 08/28/2018—Bilton [BoP 115]. The biopsy confirmed invasive cancer in her left breast and the surgeon recommended additional surgery, but another two months passed before BoP took her for surgery. Civil Doc. 3-1 at ¶¶ 20–21. In November 2018, over a year after Ms. Beck first noticed the lumps, the surgeon removed her entire left breast and part of her pectoral muscle and confirmed a diagnosis of metastatic breast cancer. 11/01/2018—Bilton [BoP 252]; 11/02/2018—Bilton [Page 18, Doc. #10] ("Post op diagnosis: Left breast cancer."); *see also* Civil Doc. 3-1 at ¶ 21 (declaration of Dr. Winkfield, reviewing records and noting a "diagnosis of stage IIB (T2N1) breast cancer"). During surgery, doctors discovered the cancer had spread to Ms.

---

[2] For simplicity here and elsewhere, the Court cites the declaration of Dr. Karen Winkfield, who reviewed Ms. Beck's medical records, for many facts relevant to Ms. Beck's treatment history, but the Court confirmed her history by reviewing the underlying medical records.

Beck's lymph nodes, 11/06/18—Bilton [Page 34, Doc. #12] (noting "metastatic carcinoma" in two nodes), and removed several nodes.  Civil Doc. 3-1 at ¶ 21.

Despite the fact that she had a drain and despite her surgeon's direction that she needed to see him about a week or less after surgery, 11/03/2018—Bilton [Page 10, Doc. #6], BoP did not return her for a post-operative visit until six weeks had passed.  Civil Doc. 3-1 at ¶ 22.  When she finally saw the surgeon again, he told her that she needed an oncology appointment for potential chemotherapy, *id.*, but five months elapsed after her surgery and over three months passed after her surgeon advised her to see an oncologist before BoP took Ms. Beck to a medical oncologist to determine appropriate treatment and therapy.  *Id.* at ¶¶ 22–23.

In total, some seventeen months passed between the time medical care providers at the prison learned about the lumps in Ms. Beck's left breast, *see id.* at ¶ 18; Civil Doc. 3-3 at ¶¶ 5–6, and the time BoP allowed her to consult with a medical oncologist.  Civil Doc. 3-1 at ¶ 23; *see also id.* at ¶ 15 (noting chemotherapy is sometimes implemented before surgery to help shrink "invasive" and "extensive" tumors).  When BoP finally took her to see a medical oncologist on April 3, 2019, the oncologist determined that it was too late to begin chemotherapy, which must be instituted soon after surgery to be effective.  *See* 04/03/2019—Evans [BoP 311]; *see also* Civil Doc. 3-1 at ¶ 23.  When BoP took her to a radiation oncologist in May 2019, he similarly determined that it was too late to begin radiation therapy.  05/03/2019—Crew [BoP 318].

Dr. Karen Winkfield, an experienced oncologist at Wake Forest Baptist Comprehensive Cancer Center who reviewed Ms. Beck's medical records, has testified

that "with respect to timing of systemic therapy following definitive surgery, delays beyond 12 weeks (3 months) compromise both recurrence free survival and overall survival." Civil Doc. 3-1 at ¶ 26. BoP waited well over three months before taking Ms. Beck to see physicians who could order such treatment. *Id.* at ¶ 23.

In January 2019, Ms. Beck reported new lumps in her right breast to prison medical officials, who confirmed the lumps. Civil Doc. 3-3 at ¶ 15; 01/30/2019—Nikki [BoP 259] (noting "firm nodule approximately golf ball size[d]" in her right breast); 02/12/2019—Hunter-Buskey [BoP 276] (noting "multiple lumps [in her] right breast; . . . the first is walnut size[d] and the second is a small peach size"). Nearly six weeks later, BoP took Ms. Beck for a PET scan, which suggested the new lumps may be benign. 03/11/2019—Guarisco [BoP 287]. About two weeks after that, BoP took her to see a surgeon, who noted a "solid mass" and cyst in her right breast, observed that the new masses "appear benign," and ordered a puncture aspiration and ultrasound guidance. 03/27/2019—Bilton [USA Bilton 3–4]. BoP did not schedule a further consultation with the surgeon until mid-June, nearly three months after the initial surgical evaluation.[3] Civil Doc. 29 at ¶ 8; Civil Doc. 44 at ¶ 9. It appears Ms. Beck has received the tests and procedures the surgeon ordered in March, Civil Doc. 45 at 4; Civil Doc. 44 at ¶ 9, but there are still "multiple nodularities" in her right breast and the surgeon has ordered

---

[3] BoP refers to the June appointment as an "initial visit" with a surgeon to examine the new right breast masses and to schedule an appointment for a biopsy at a later date. Civil Doc. 29 at ¶ 8. BoP states that the surgeon "will not conduct a biopsy during an initial visit," *id.*, but Ms. Beck saw the surgeon about her right breast masses in March, 03/27/2019—Bilton [USA Bilton 3–4], so the June visit was a "follow-up." Civil Doc. 13 at ¶ 5; *see also* 05/11/2019—Ortiz [BOP 323] (recommendation of BoP official to "refer back to surgery").

another ultrasound, noting the potential need for a biopsy. Civil Doc. 45 at 5. Pursuant to a court order to schedule recommended treatments, *see infra*, BoP has scheduled the ultrasound and other appointments. Civil Doc. 47 at ¶¶ 1–4.

As noted *supra*, Dr. Winkfield, an experienced oncologist, reviewed Ms. Beck's medical records. While she was unable to determine from BoP's records "whether the above delays in care . . . have resulted in progression of [Ms. Beck's] cancer," Civil Doc. 3-1 at ¶ 27, Dr. Winkfield testified without dispute that "[p]rompt evaluation is particularly important in patients who have a family history of breast cancer" and that the "delays in time to surgery and subsequent delays in adjuvant therapy clearly raise a significant risk of relapse and irreparable harm to Ms. Beck." *Id.* at ¶¶ 11, 27.

In early December 2018, Ms. Beck through counsel asked the Warden of FCI Aliceville to file a compassionate release motion to reduce her sentence based on her medical condition and the poor medical care she was receiving. Doc. 522-1 at 6. On December 17, the Warden acknowledged receipt of the request and explained BoP's general criteria for evaluating such requests. *Id.* at 5. After over a month of no action on the request, Ms. Beck submitted a second request to BoP to file a compassionate release motion on her behalf. Doc. 521-1 at ¶ 3. A week later, with no BoP action on either request, Ms. Beck filed her motion for compassionate release with this Court on January 24, 2019. Doc. 494.

Nearly two months later, on the day the Government's response was due, *see* Text Order 02/27/19, the Government sought a stay so that BoP could finish its administrative review of Ms. Beck's request. Doc. 510. Ms. Beck did not object, *id*, and the Court

granted the stay. Doc. 511. Another six weeks passed with no action by BoP on the request, and on May 10, 2019, Ms. Beck initiated a civil suit against several BoP officials and a private contractor, alleging violations of her Eighth Amendment rights against cruel and unusual punishment. Civil Doc. 1. She sought a temporary restraining order and preliminary injunction. Civil Doc. 3. BoP denied her request for a compassionate release motion almost immediately thereafter. Doc. 521-1 at 8. The same day, the Court lifted the stay and directed the Government to file a response to her compassionate release motion. *See* Text Order 05/13/2019; Doc. 521 (Government's response in opposition).

The Court held a hearing on Ms. Beck's motion for a TRO in her civil case on May 17, 2019. Civil Minute Entry 05/17/2019. On May 20, the Court entered a TRO compelling three BoP officials in their official capacities to take specific steps to provide urgent medical treatment to Ms. Beck for her cancer. Civil Doc. 15; *see also* Civil Doc. 16 (Amended TRO). The Court found that Ms. Beck had shown a likelihood of success on the merits of her claim that BoP officials' indifference to her life-threatening medical condition and treatment violated her Eighth Amendment rights. Civil Doc. 16. After another hearing, *see* Minute Entry 06/05/2019, the Court extended the Amended TRO while considering this motion and a motion for preliminary injunction. Civil Doc. 40.

The Court will address additional facts as needed in the context of the issues presented.

## II. Compassionate Release

Federal law has long authorized courts to reduce the sentences of federal prisoners facing extraordinary health conditions and other serious hardships, but only under very

limited circumstances.  Before passage of the First Step Act of 2018, district courts could grant compassionate release sentence reductions only upon a motion by the BoP Director.[4]  *See* Pub. L. No. 98–473, ch. II(D) § 3582(c)(1)(A), 98 Stat. 1837 (1984); *see also Green v. Apker*, No. 5:13–HC–2159–FL, 2014 WL 3487247, at *2 (E.D.N.C. July 11, 2014) (collecting cases and noting that "BOP's decision regarding whether or not to file a motion for compassionate release is judicially unreviewable").  Then as now, a defendant must satisfy one of two statutory conditions before a court can grant a BoP compassionate release motion:  (*i*) the defendant has to be at least 70 years old, have served at least 30 years in prison, and the BoP Director must have determined the defendant was not a danger to the public; or (*ii*) "extraordinary and compelling reasons" warrant the reduction.  18 U.S.C. § 3582(c)(1)(A).  When BoP files such motions, reviewing courts also must consider the sentencing factors set forth in 18 U.S.C. § 3553(a) and can only grant reductions to defendants who met the statutory requirements if the reduction was "consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1).

To assist courts, the Sentencing Commission adopted U.S.S.G. § 1B1.13 as the applicable policy statement for motions filed by the BoP Director under § 3582(c)(1)(A). The guideline essentially repeats the statutory prerequisites and adds only a requirement

---

[4] For a discussion of the history of compassionate release in the federal system before the First Step Act, see William W. Berry III, *Extraordinary and Compelling:  A Re-Examination of the Justifications for Compassionate Release*, 68 Md. L. Rev. 850, 859–70 (2009).

that the defendant must not be "a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2).

The application notes to § 1B1.13 are more specific. The notes list three specific categories and examples of "extraordinary and compelling reasons," along with a fourth catch-all provision.

Specifically, the notes discuss when a defendant's medical condition (subdivision A), health and age together (subdivision B), or family circumstances (subdivision C) will qualify. U.S.S.G. § 1B1.13, application note 1. Subdivision A provides that a "medical condition of the defendant" may qualify as an "extraordinary and compelling reason" justifying a sentence reduction in several different circumstances, such as when, *inter alia*, the defendant has a "terminal illness." *Id.* at note 1(A)(i). Subdivision D acknowledges that there may be other situations which constitute extraordinary and compelling reasons and provides a non-specific blanket authorization for early release, labeled "Other Reasons." *Id.* at note 1(D). That provision allows compassionate release if, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id.*

In 2018, Congress passed the First Step Act. Pub. L. 115-391, 132 Stat. 5194. Among other things, it amended § 3582(c)(1)(A) to add a provision allowing courts to consider motions by defendants for compassionate release without a motion by the BoP Director so long as the defendant has asked the Director to bring such a motion and the

Director fails or refuses.[5]  The First Step Act applies the same statutory requirements to a defendant's motion for compassionate release as previously applied, and still apply, to motions by the Director:  "extraordinary and compelling reasons" must warrant the reduction,[6] the court must consider the § 3553(a) factors, and the reduction must be "consistent" with any "applicable" policy statements issued by the Sentencing Commission.  18 U.S.C. § 3582(c)(1)(A)(i).

There is no policy statement applicable to motions for compassionate release filed by defendants under the First Step Act.  By its terms, the old policy statement applies to motions for compassionate release filed by the BoP Director and makes no mention of motions filed by defendants.  U.S.S.G. § 1B1.13 ("Upon motion of the Director of the Bureau of Prisons . . . the court may reduce a term of imprisonment . . . ."); *id.* at application note 4 ("A reduction under this policy statement may be granted only upon motion by the Director of the Bureau of Prisons.").  The Sentencing Commission has not amended or updated the old policy statement since the First Step Act was enacted, *see, e.g.*, *United States v. Gross*, No. 2:04–CR–32–RMP, 2019 WL 2437463, at *2 (E.D.

---

[5] Specifically, courts may now consider motions for compassionate release "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  18 U.S.C. § 3582(c)(1)(A); *see also* First Step Act of 2018, Pub. L. 115-391, Title VI § 603, 132 Stat. 5194 (Dec. 21, 2018).

[6] The other statutory possibility concerns age and sentence length requirements that Ms. Beck clearly does not meet.  *See* § 3582(c)(1)(A)(ii).  The Court will not discuss them further.

Wash. June 11, 2019), nor has it adopted a new policy statement applicable to motions filed by defendants.[7]

While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether "extraordinary and compelling reasons" warrant a sentence reduction under § 3582(c)(1)(A)(i).  An interpretation of the old policy statement as binding on the new compassionate release procedure is likely inconsistent with the Commission's statutory role.  *See United States v. Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923, at *3 (S.D. Tex. June 17, 2019) ("Because the Commission's statutory authority is limited to explaining the appropriate use of sentence-modification provisions under the *current* statute, 28 U.S.C. § 994(a)(2)(C), an amendment to the statute may cause some provisions of a policy statement to no longer fall under that authority . . . ." (emphasis in original)).  It is also inconsistent with the First Step Act, which was enacted to further increase the use of compassionate release and which explicitly allows courts to grant such motions even when BoP finds they are not appropriate.  Pub. L. 115-391, Title VI § 603(b), 132 Stat. 5194 (Dec. 21, 2018) (captioned "Increasing the use and transparency of compassionate release"); *see also Cantu*, 2019 WL 2498923, at *4 ("[T]he policy-statement provision that was previously

_____

[7] As the Sentencing Commission lacks a quorum to amend the U.S. Sentencing Guidelines, it seems unlikely there will be a policy statement applicable to motions brought by defendants in the near future.  The Commission consists of seven voting members and requires four for a quorum to amend the guidelines.  28 U.S.C. §§ 991(a), 994(a).  As of the second quarter of fiscal year 2019, the Commission has only two voting members.  U.S. Sentencing Comm'n, *Annual Report* 2–3, 2018, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2018/2018-Annual-Report.pdf.

applicable to 18 U.S.C. § 3582(c)(1)(A) no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the *appropriate use* of sentence-modification provisions under § 3582 (emphasis in original)).[8]  Thus, courts may, on motions by defendants, consider whether a sentence reduction is warranted for extraordinary and compelling reasons other than those specifically identified in the application notes to the old policy statement.

## III.    Findings and Analysis

Ms. Beck's motion for a sentence reduction is properly before the Court.  She first requested compassionate release through a letter from her lawyer to Warden Patricia V. Bradley, whose office received the letter on December 10, 2018.  Doc. 522-1 at 6.  The Warden acknowledged receipt of her request on December 17, *id.* at 5, but did not act on her request until issuing a denial letter in May 2019.  Doc. 521-1 at ¶ 4, p. 8.  Ms. Beck filed her motion in this Court on January 24, 2019, Doc. 494, after "the lapse of 30 days from the receipt of [her] request by the warden."  18 U.S.C. § 3582(c)(1)(A).

---

[8] District courts have taken varying approaches to the old policy statement in evaluating compassionate release motions filed by defendants under the First Step Act.  Many courts have, without discussion, applied the old policy statement.  *See, e.g.*, *United States v. Heromin*, No. 8:11–cr–550–T–33SPF, 2019 WL 2411311, at *1–2 (M.D. Fla. June 7, 2019); *United States v. Willis*, No. 15–cr–3764 WJ, 2019 WL 2403192, at *2 (D.N.M. June 7, 2019); *Gross*, 2019 WL 2437463, at *2–3.  At least one court has held that courts cannot "disregard" the old policy statement and order compassionate release without finding extraordinary and compelling circumstances.  *See United States v. Overcash*, No. 3:15-CR-263-FDW-1, 2019 WL 1472104, at *2 (W.D.N.C. Apr. 3, 2019).  Another court has suggested that the old policy statement still applies and that courts cannot grant compassionate release for reasons other than those listed in subdivisions A through C of the application note.  *See United States v. Shields*, No. 12-cr-00410-BLF-1, 2019 WL 2359231, at *4 (N.D. Cal. June 4, 2019).  Yet another court disagrees with *Shields* and has ordered release for extraordinary and compelling reasons other than those enumerated in the application note.  *See Cantu*, 2019 WL 2498923, at *5.

As discussed *supra*, compassionate release motions require consideration of any relevant § 3553(a) factors and whether there are "extraordinary and compelling reasons" that warrant a sentence reduction. Any reduction must also be consistent with "applicable" policy statements issued by the Sentencing Commission.

Although there is no policy statement applicable to a defendant's motion for compassionate release, the old policy statement does provide some assistance. Unsurprisingly, it overlaps to some extent with statutory considerations such as the § 3553(a) factors. For example, the old policy statement requires courts to consider the defendant's dangerousness, U.S.S.G. § 1B1.13(2), and that is also a part of the § 3553(a) requirement that courts consider the need to protect the public from further crimes of the defendant. *See* 18 U.S.C. § 3553(a)(2)(C). Similarly, the old policy statement says that a defendant's medical condition can be an appropriate reason for a sentence reduction, U.S.S.G. § 1B1.13, application note 1(A), (B), and one of the § 3533(a) factors is a defendant's need for medical treatment. *See* 18 U.S.C. § 3553(a)(2)(D).

The Court first considers whether extraordinary and compelling reasons exist under § 3582(c)(1)(A)(i). Because it still provides helpful guidance, the Court then evaluates the motion in light of the old policy statement and its application notes, as well as other indicators of Sentencing Commission policy. Finally, the Court will evaluate a sentence reduction under the § 3553(a) factors.

### a. Extraordinary and Compelling Reasons under 18 U.S.C § 3582(c)(1)(A)(i)

Ms. Beck has invasive breast cancer and has received grossly inadequate treatment for her condition while serving her sentence in BoP custody. During the lengthy delays,

her cancer spread to her lymph nodes. Absent judicial oversight, she is unlikely to receive better treatment at FCI Aliceville going forward. She is in urgent need of appropriate treatment to prevent the further spread of her disease and the potential loss of her life. These are "extraordinary and compelling reasons" to reduce her sentence under § 3582(c)(1)(A)(i).

After Ms. Beck reported lumps in her left breast to prison officials and imaging suggested it was cancer, BoP waited eight months to take her for a biopsy. Civil Doc. 3-1 at ¶ 20. The biopsy confirmed invasive cancer in her left breast, *id.*, and two months later, when BoP finally took her to surgery, the disease had metastasized to her lymph nodes and required a radical mastectomy. 11/01/2018—Bilton [BoP 252]; 11/06/2018— Bilton [Page 34, Doc. #12]; Civil Doc. 3-1 at ¶ 21. After surgery, BoP disregarded her surgeon's order of a follow-up visit after one week and did not return her to the surgeon for six weeks. 11/03/2018—Bilton [Page 10, Doc. #6]; Civil Doc. 3-1 at ¶ 22. BoP delayed scheduling an oncology appointment for five months, and as a result, she was unable to obtain the benefits of chemo or radiation therapy. 04/03/2019—Evans [BoP 311]; 05/03/2019—Crew [BoP 318]. Ms. Beck has new lumps in her right breast, *see, e.g.*, Civil Doc. 3-3 at ¶ 15, and BoP continues to countenance delays in treatment by blaming logistical issues, *see supra* note 3, and it has provided erroneous information about her recent appointments to the Court. *See* Civil Doc. 18-1 at ¶¶ 1–2; Civil Doc. 23 at 2. Although BoP has timely scheduled certain appointments of late, *see* Civil Docs. 29, 47, that was pursuant to a temporary injunction directing BoP officials to ensure that

appointments recommended by treating physicians were scheduled as quickly as possible. Civil Docs. 16, 40 at ¶ 3.  As its name indicates, this order was temporary.

As these facts establish, the quality of treatment BoP has provided Ms. Beck for her cancer has been abysmal.  *See, e.g.*, Civil Doc. 16 at pp. 3–6, ¶¶ 2–8; Civil Doc. 3-1 at ¶ 24 ("[T]he . . . course of action by the prison system in responding to Ms. Beck's known breast cancer, punctuated by repeated delays in care, was grossly inadequate . . . [and] there is no medical justification").  BoP has not acknowledged deficiencies in Ms. Beck's medical care, *see, e.g.*, Civil Doc. 12 at ¶ 9 (declaration of a BOP physician's assistant, stating that "the Bureau is currently providing inmate Beck with appropriate medical care for her breast cancer"), which indicates BoP is unlikely to meet its constitutional obligations in the future.[9]  As long as she stays in BoP custody, she faces a substantial likelihood of substandard medical care for her life-threatening disease.

Dr. Winkfield's testimony, which BoP has not disputed, establishes that the delays in treatment have increased the risk that Ms. Beck's cancer has spread or will recur and has compromised her prospects for survival.  Civil Doc. 3-1 at ¶¶ 24, 26–27.  Though the statute "does not define—or place any limits on—what 'extraordinary and compelling reasons' might warrant" a sentence reduction, *Cantu*, 2019 WL 2498923, at *5 (citations and quotations omitted), one certainly hopes that BoP's gross mismanagement of medical

---

[9] As the Government often argues in criminal cases, "past behavior best predicts future behavior."  *United States v. Paulino*, 335 F. Supp. 3d 600, 614 (S.D.N.Y. 2018) (citations and quotations omitted); *see also* William Faulkner, Requiem for a Nun 73 (1s Vintage Int'l ed. 2011) ("The past is never dead.  It's not even past."); William Shakespeare, The Tempest, act II, scene I (1611) ("What's past is prologue.").

care for an inmate's deadly disease is extraordinary.  *See* Black's Law Dictionary,

*Extraordinary* (11th ed. 2019) ("Beyond what is usual, customary, regular, or

common.").  Breast cancer can kill without appropriate medical care, and Ms. Beck's

need to obtain adequate treatment for her disease when BoP appears unable to provide it

without court oversight is a compelling reason for a sentence reduction.  Black's Law

Dictionary, *Compelling Need* (11th ed. 2019) ("A need so great that irreparable harm or

injustice would result if it is not met.").

Ms. Beck has shown that extraordinary and compelling reasons warrant a

reduction in her sentence under § 3582(c)(1)(A)(i).  *See Cantu*, 2019 WL 2498923, at

*3–6 (on motion by a defendant, construing § 3582 to determine whether extraordinary or

compelling reasons existed on a basis other than those listed in the old policy statement).

### b.  The Reduction is Consistent with the Sentencing Commission's Guidance

In evaluating compassionate release motions filed by defendants, the old policy

statement does not bind the Court's interpretation of § 3582(c)(1)(A)(i), *see* discussion

*supra*, but it does provide useful guidance.  Read as a whole, the application notes

suggest a flexible approach which considers all relevant circumstances.  They indicate

that medical conditions, alone or in conjunction with other factors, can constitute

extraordinary and compelling reasons, and they recognize that the examples listed in the

application note do not capture all extraordinary and compelling circumstances.  U.S.S.G.

§ 1B1.13, application note 1(A)–(B), (D).

Subdivision A takes a non-exclusive approach to terminal illness, providing a few

examples and noting that "[a] specific prognosis of life expectancy (i.e., a probability of

death within a specific time period) is not required."  U.S.S.G. § 1B1.13, application note

1(A)(i); *see also* U.S. Sentencing Comm'n, *Amendments to the Sentencing Guidelines* 1–

2, Apr. 28, 2016 (noting that one purpose of 2016 Amendments to the application note

was to broaden the "terminal illness" category because of difficulties in estimating

prognosis and to provide a "non-exhaustive list of . . . terminal illness[es]" for "added

clarity").  It specifically lists "metastatic solid-tumor cancer" as an example of a terminal

illness warranting a sentence reduction, U.S.S.G. § 1B1.13, application note 1(A)(i), and

that is what Ms. Beck has.[10]

It is undisputed that breast cancer can be a terminal disease and that Ms. Beck's

family history of breast cancer, the delay-induced lack of chemotherapy and radiation

therapy, and the delays in other procedures, including biopsies and surgery, place her at

an abnormally high risk of recurrence.  Civil Doc. 3-1 at ¶¶ 24–27 (noting she stands at a

"significant risk of relapse and irreparable harm").  It is also undisputed that the

trajectory her cancer will take is heavily dependent on the quality of treatment she

receives going forward.  *See, e.g.*, *id.* at ¶¶ 16–17, 25–26 ("Studies have shown that with

---

[10] It appears undisputed that Ms. Beck's doctors have diagnosed her with this form of cancer. *See, e.g.*, 11/02/2018—Bilton [Page 18, Doc. #10] ("Post op diagnosis:  Left breast cancer"); 11/01/2018—Bilton [BOP 252] (noting "metastatic cancer" in the left breast); 11/06/2018—Bilton [Page 34, Doc. #12] (noting "metastatic carcinoma" in two nodes); 02/12/2019—Hunter-Buskey [BOP 276] ("postop stage 2B – invasive lobular carcinoma left breast"); 04/03/2019—Evans [BOP 310] ("Primary diagnosis: T2N1aM0 left breast cancer").  While the record is not explicit as to whether her condition still meets this definition post-operatively, *compare* 02/12/2019—Hunter-Buskey [BOP 276] ("postop stage 2B – invasive lobular carcinoma left breast"), *with* 03/11/2019—Griffin [BOP 290] (post-op imaging suggests there is "[n]o evidence of recurrent or metastatic disease."), BoP points to no evidence of a physician finding that she is cancer-free and its own doctor appears to acknowledge that she still has cancer.  Doc. 521-1 at 5. She is at high risk for recurrence and may have new tumors in her right breast, and the poor medical care is contributing to the severity of her medical condition.

respect to timing of systemic therapy following definitive surgery, delays beyond 12 weeks (3 months) compromise both recurrence free survival and overall survival."). Even BoP's doctor characterizes her prognosis as "undetermined." Doc. 521-1 at 5. While a standard case of properly-treated breast cancer may not qualify as a "terminal illness" under Subdivision A, Ms. Beck has not received proper treatment, and it is questionable that BoP will provide appropriate medical care for this life-threatening disease going forward, at least not without court oversight. *See infra* Section III(d). A sentence reduction is consistent with Subdivision A.

Before the First Step Act, the Sentencing Commission recognized that the specific examples provided in Subdivisions A through C were likely to exclude cases where compassionate release was nonetheless appropriate. Thus, it gave the BoP Director—the only party at the time who could make such a motion—discretion to move for a sentence reduction if there existed "in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13, application note 1(D). Though Subdivision D is reserved to the BoP Director, the Commission nonetheless affirmed, even before the First Step Act, that courts are in a "unique" position to determine whether such circumstances are present.[11] Read in light of the First Step Act, it is consistent with the old policy statement and with

_____

[11] Specifically, in 2016, the Commission noted that "[w]hile only the Director of the Bureau of Prisons has the statutory authority to file a motion for compassionate release, the Commission finds that the court is in a unique position to assess whether the circumstances exist." U.S. Sentencing Comm'n, *Amendments to the Sentencing Guidelines* 3, Apr. 28, 2016 (internal quotations omitted); *see also* U.S.S.G. § 1B1.13, application note 4.

the Commission guidance more generally for courts to exercise similar discretion as that previously reserved to the BoP Director in evaluating motions by defendants for compassionate release. *See* discussion *supra*; *cf. Cantu*, 2019 WL 2498923, at *5 ("[T]he correct interpretation of § 3582(c)(1)(A) . . . is that when a defendant brings a motion for a sentence reduction under the amended provision, the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)–(C) warrant granting relief.").

As previously discussed, breast cancer is a life-threatening illness even after tumors are removed, and particularly so with a family history of breast cancer, delayed biopsies and surgeries, and a lack of chemotherapy or radiation therapy. *See, e.g.*, Civil Doc. 3-1 at ¶¶ 25–26. BoP's indifference to Ms. Beck's cancer treatment has likely reached the level of a constitutional violation, *see* Civil Doc. 16, creating a significant risk that her cancer will spread, if it has not already, and compromising her chance of survival. Civil Doc. 3-1 at ¶¶ 24–27. Her continued detention in BoP custody poses an unacceptable risk to her health and life and constitutes an extraordinary and compelling circumstance under Subdivision D of the application note. *Cf. Sester v. United States*, 566 U.S. 231, 242–43 (2012) (noting that the pre-First Step Act compassionate release provision in § 3582(c)(1)(A) also provides a mechanism for a district court to grant relief when its "failure to anticipate developments that take place after . . . sentencing . . . produce unfairness to the defendant." (internal citations and quotations omitted)). A sentence reduction is consistent with the substance of Subdivision D.

The old policy statement also requires that the defendant not pose a "danger to the safety of any other person or to the community" under 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13(2). This inquiry heavily depends on the nature and circumstances of the offense and the history and characteristics of the defendant, § 3142(g)(1), (3), both of which are core considerations in the § 3553(a) analysis. As such, the Court will consider dangerousness together with the other applicable § 3553(a) factors in the next section.

### c. The § 3553(a) Factors and Dangerousness

Considering the nature and circumstances of the offense, Ms. Beck's criminal conduct in 2012 was undoubtedly serious. She and her husband manufactured and distributed large amounts of methamphetamine from their home and possessed firearms in furtherance of that offense. *See* Doc. 192. After she was arrested on state charges and released on bond, she continued to engage in the methamphetamine business out of her home. *See id.* at 16. Her seventeen-year-old daughter lived in the home and her parents allowed her to participate in producing methamphetamine. Doc. 429-1 at ¶¶ 52–53, 58. As this case sadly shows, methamphetamine is a dangerous, addictive drug that destroys individuals and families, and the need to deter and punish persons who place these drugs into the community is recognized by the significant sentences suggested by the guidelines when methamphetamine is involved. *See generally* U.S.S.G. § 2D1.1.

As to her history and characteristics, Ms. Beck had a minor criminal history consisting only of misdemeanors before committing the 2012 crimes. *See* Doc. 429-1 at ¶¶ 80–87. Most were worthless check convictions, *id.* at ¶¶ 81–84, and except for a probationary sentence in 2009 for contributing to the delinquency of a minor, *id.* at ¶ 86,

the punishment was limited to restitution and court costs. For the 2009 sentence, she received 12 months of probation, *id.* at ¶ 86, which it appears she successfully completed. In her 42 years, she had never been to prison before the arrests leading to the convictions in this case and she had no previous involvement in the drug trade. None of her prior criminal conduct was violent. While she and her husband kept firearms in their home in connection with their drug business, an undoubtedly dangerous crime, there was no evidence or indication that she ever used or pointed a gun at anyone or that she threatened anyone with a firearm.

Ms. Beck had a long history of legitimate employment, working steadily in the family business of servicing septic tanks for twenty years. *Id.* ¶ 103. She has longstanding ties to Ararat, North Carolina, where she plans to reside upon release, Doc. 494 at 3 ¶ 1, and she lived in her home there for over twenty-five years before she committed the crimes that led to her incarceration. Doc. 429-1 at ¶ 97.

 As a teenager, Ms. Beck was molested by her grandfather, Doc. 429-1 at ¶ 99, and shortly before she committed the drug and firearms crimes in 2012, her daughter was molested by a family friend. *Id.* at ¶ 100. Soon after, Ms. Beck began using methamphetamine and became addicted. *See id.* at ¶¶ 100–01. While Ms. Beck was substantially involved in the criminal conspiracy and was not a minor participant, the record shows that her husband played a larger role in distributing the methamphetamine. *See* Doc. 192.

After her second arrest related to methamphetamine, Ms. Beck took steps to mitigate the harm caused by her criminal conduct. Even before her federal indictment,

she cooperated with law enforcement, *see* Doc. 249 at ¶¶ 1–2, and upon indictment she quickly pled guilty. Doc. 429-1 at ¶¶ 76–77. She continued her cooperation after being indicted and rendered substantial assistance to authorities. Doc. 249 at ¶ 3; Minute Entry 12/12/2013.

Ms. Beck's invasive breast cancer, her recent radical mastectomy, the new masses in her right breast, her dependence on cancer treatment and therapy, her age (47), the absence of any indication of violence in her past, and her work history make recidivism unlikely.[12] Sentencing Commission studies suggest that retroactive sentence reductions do not increase recidivism rates[13] and that recidivism is extremely rare among inmates who qualify for BoP's compassionate release program.[14] While the BoP Director did not make a compassionate release motion for Ms. Beck, someone with her health issues is more comparable to those offenders than to the general population of federal prisoners.

---

[12] Federal offenders with Ms. Beck's acceptance of responsibility, age (47 now, 42 at sentencing), and final offense level (34), *see* Doc. 429-1 at 3, 18, have a relatively low rate of recidivism. *See* U.S. Sentencing Comm'n, *Recidivism Among Federal Offenders: A Comprehensive Overview* 20–21, 23, Mar. 2016, *available at* https://www.ussc.gov/sites/default/ files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf; U.S. Sentencing Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders*, Dec. 2017, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf. While offenders with her criminal history score (2) and category (II), Doc. 429-1 at 20, recidivate at a somewhat higher rate, the rate is still relatively low compared to offenders with a more extensive criminal history. *See Id.* at 18–19.

[13] U.S. Sentencing Comm'n, *Recidivism Among Federal Offenders Receiving Retroactive Sentence Reductions: The 2011 Fair Sentencing Act Guideline Amendment*, Mar. 2018, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2018/20180328_Recidivism_FSA-Retroactivity.pdf.

[14] U.S. Dep't of Justice, *The Federal Bureau of Prisons' Compassionate Release Program* iv, Apr. 2013, *available at* https://oig.justice.gov/reports/2013/e1306.pdf.

Though recidivism is always a risk, there are conditions the Court can impose to "reasonably assure . . . the safety of any other person and the community," 18 U.S.C. § 3142(g), despite the serious nature of her crimes. She will be on supervised release for five years, and the standard and special conditions previously imposed will result in substantial oversight by the Probation Office. *See* Doc. 277 at 3–4 (noting, among other conditions, that she is subject to warrantless searches on reasonable terms and may not leave the district without permission from the Court or her probation officer). As a precaution, the Court will add two additional requirements: one, Ms. Beck may only live at a place and with persons approved in advance by the probation officer to ensure that she is not living with persons who may still be involved with illegal drugs, and two, she may not associate with any co-defendant, excepting her husband, or any person on pre-trial release or post release supervision. With appropriate supervision, the Court concludes that Ms. Beck "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

The 3553(a) factors, taken as a whole, favor release. Though her offense was serious, Ms. Beck has been in custody for over six years; that is a significant punishment, especially for someone who had never been incarcerated before. *Cf., e.g.*, *United States v. Lenagh*, No. 8:07CR346, 2009 WL 296999, at *6 (D. Neb. Feb. 6, 2009) ("A sentence of 24 months is a significant sentence, especially to an offender who has never been incarcerated at all."). It is longer than the five-year mandatory minimum sentence required by Congress for her firearms offense. Given Ms. Beck's minor criminal record before she committed these crimes, that the crimes were precipitated by a traumatic life

24

event and connected to her addiction, and that she timely accepted responsibility and assisted the authorities, her six-plus years of imprisonment and additional supervised release are sufficient to punish her for her crimes and deter her from committing future offenses. *See* 18 U.S.C. § 3553(a)(2)(A)–(B). She has served nearly two years of her term with invasive breast cancer, and BoP has repeatedly mismanaged her care, including delaying medical appointments for so long that neither chemo nor radiation therapy would be effective. *See supra* Section I. "This means that [her] sentence has been significantly more laborious than that served by most inmates. It also means that further incarceration in [her] condition would be greater than necessary to serve the purposes of punishment set forth in § 3553(a)(2)," *United States v. McGraw*, No. 2:02-cr-00018-LJM-CMM, 2019 WL 2059488, at *5 (S.D. Ind. May 9, 2019), and supports a reduction in her sentence "to provide the defendant with needed . . . medical care . . . in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). And, for the reasons noted *supra*, further incarceration is not needed to protect the public. 18 U.S.C. § 3553(a)(2)(C).

A reduction in Ms. Beck's sentence to time served—approximately 76 months—is sufficient to serve the purposes of punishment under § 3553(a)(2). And, given her breast cancer and the poor treatment she has received at BoP, a longer sentence would be greater than necessary to serve those purposes. As such, the applicable § 3553(a) factors support Ms. Beck's request for compassionate release.

### d. The Government's Opposition to Release

The Government opposes Ms. Beck's request for compassionate release on several grounds. First, the Government suggested at oral argument that Ms. Beck will receive

better medical care going forward because her case now has BoP's attention and certain appointments have now been (belatedly) scheduled, apparently in response to Ms. Beck's civil suit.  Even assuming Ms. Beck's treatment has improved of late,[15] there is nothing to suggest—much less to guarantee—that this recent deviation from the past trend of inadequate care will continue.  The fact that it has recently promptly scheduled appointments as required by a court order does not prove it will continue to provide appropriate care without court oversight.  *See* Civil Doc. 40; Civil Doc. 47.  Moreover, as noted in *supra* Section III(a), BoP continues to justify delays by blaming non-BOP officials, such as her oncologist, and logistical issues, and it has provided erroneous information about her recent appointments to the Court.  The quality of Ms. Beck's cancer treatment at BoP in the past remains the best predictor of what it will be in the future.  *See supra* note 9.

Second, the Government relies on the fact that BoP doctors have reviewed Ms. Beck's administrative request for compassionate release and determined that she does not qualify.  Doc. 521 at 6–7.  But BoP's conclusion that Ms. Beck's condition is not severe enough to warrant release is entitled to little, if any, deference.  For one, BoP's internal criteria for assessing when compassionate release is appropriate are stricter than U.S.S.G.

---

[15] *See* Civil Doc. 23 at 2 (describing an error in the declaration of a BoP physician assistant who stated Ms. Beck had a surgery consultation scheduled before the end of May, which the Court relied on in crafting a TRO, but which turned out not to be true),

§ 1B1.13 and the application note.[16]  *See McGraw*, 2019 WL 2059488, at *3–4 (noting

the BoP doctor's conclusion "does not reflect the standard set forth in the Application

Notes" and conducting a *de novo* analysis of whether the defendant's medical condition

qualified as extraordinary and compelling).  The BoP physician who reviewed Ms.

Beck's request for a compassionate release motion did not consider whether, as suggested

in her records, she has metastatic solid-form cancer, which is specifically listed as an

example of a terminal illness in the old application note.  U.S.S.G. § 1B1.13, application

note 1(A)(i).[17]

Moreover, the terms of the First Step Act give courts independent authority to

grant motions for compassionate release and says nothing about deference to BoP, thus

establishing that Congress wants courts to take a *de novo* look at compassionate release

motions.  As noted *supra*, before 2018, courts could only grant compassionate release

upon motion of BoP, and BoP's decision not to file such motions was unreviewable.

That changed with The First Step Act, which removed sole responsibility from BoP and

---

[16] *Compare, e.g.*, Doc. 522-1 at 5 (letter from the Warden, noting the BoP will only move for compassionate release "in *particularly* extraordinary or compelling circumstances" (emphasis added)), *and* Doc. 521-1 at 5 (BoP's reduction in sentence form, asking, *inter alia*, whether the inmate has a "life expectancy [of] eighteen (18) months or less"), *with* 18 U.S.C. § 3582(c)(1)(A) (simply requiring "extraordinary and compelling reasons"), *and* U.S.S.G. § 1B1.13, application note 1(A)(i) (noting that a "specific prognosis of life expectancy . . . is not required").

[17] BoP's other criteria are tailored to separate provisions of the old policy statement addressing debilitating, rather than terminal, medical conditions.  *See* U.S.S.G. § 1B1.13, application note 1(A)(ii); Dep't of Justice, Program Statement 5050.50(3)(b), Jan. 17, 2019, *available at* https://www.bop.gov/policy/progstat/5050_050_EN.pdf (listing these criteria under the "Debilitated Medical Condition" section of BoP's compassionate release criteria).  Because those provisions have no arguable applicability, the Court need not address them.

authorized courts to consider motions of inmates who had tried and failed to convince BOP to move on their behalf.

Finally, the Government contends that Ms. Beck may present a danger to the community given the seriousness of her offenses and the fact that she would be released into Surry County, where the drug conspiracy took place. Doc. 521 at 5 n.1. But of the co-conspirators with whom she most closely associated, the more culpable, including her husband, are still incarcerated and will remain in prison for several more years.[18] Ms. Beck's substantial assistance is public knowledge, which also diminishes the risk others will attempt to involve her in new criminal activity. And, as noted *supra*, the conditions of supervised release will limit her ability to engage in criminal conduct without swift detection.

## IV.    Conclusion

Ms. Beck committed serious drug and firearms offenses with her husband in 2012 and 2013 that warrant substantial punishment. She has served over six years of her sentence, nearly two of them with breast cancer treated so untimely as to significantly reduce her chances of survival. Ms. Beck's invasive cancer and the abysmal health care BoP has provided qualify as "extraordinary and compelling reasons" warranting a reduction in her sentence to time served. *See* 18 U.S.C. 3582(c)(1)(A)(i). While the old

---

[18] In 2013, Mr. Beck received a sentence of 195 months imprisonment, Doc. 276 at 2, which was later reduced to 171 months based on a retroactive guideline amendment. Doc. 440. Johnny Ray Bowman received a sentence of 135 months and is still in prison. Doc. 273. The other co-defendants with whom she was primarily associated, *see* Doc. 192, were mostly addicts without firearm charges who received shorter sentences. *See* Docs. 244, 245, 246, 266, 281 (reduced at 419), 304, 305 (revoked at 519), 306.

policy statement is not directly applicable to motions filed by defendants, a reduction is consistent with its general guidance and the Sentencing Commission's intent. With appropriate supervision, Ms. Beck poses little risk of recidivism or danger to the community. She has already served an arduous sentence, and the § 3553 factors support a sentence reduction. As such, Ms. Beck is entitled to compassionate release.

It is **ORDERED** that the defendant's motion for a sentence reduction based on compassionate release, Doc. 494, is **GRANTED.** Her sentence will be reduced to time served, with supervised release for 5 years to follow on terms previously imposed and as supplemented with additional terms as stated in this order. This sentence will be stayed for twenty-one days to give BoP time to implement it and to give the Probation Office time to evaluate Ms. Beck's proposed residence. Judgment will be entered separately. The Clerk shall provide a copy of this Order to the Probation Office

This the 28th day of June, 2019.

_____
UNITED STATES DISTRICT JUDGE